In the Matter of CAROL A. WHITE, as Coguardian of DENEKE A. L. GRANT, an Infant, Appellant. THOMAS R. WHITE, Respondent.

First Department, July 17, 1986

---

### APPEARANCES OF COUNSEL

*Philip C. Segal* of counsel *(Gerald Mann,* attorney), for appellant.

*Stanley Levine* of counsel *(Stone, Saltzman & Israel, Robert J. Saltzman,* attorneys), for respondent.

### OPINION OF THE COURT

Per Curiam.

The issue presented on this appeal is whether custody of the orphaned child, Deneke Grant, should be changed from her adult cousin, petitioner Carol White, to her uncle, respondent cross petitioner Thomas White. Deneke Grant was born on May 19, 1983, to Margarette Grant. Margarette, Deneke and Damian, Deneke's eight-year-old half brother resided on the first floor of a small apartment building owned by Thomas White, Margarette's brother, located at 834 East 230th Street in The Bronx. Carol White, a niece of both Thomas and Margarette resided on the second floor in the same building, with her nine-year-old daughter Chanel. Carol and Margarette were relatively close in age, both in their thirties, and in similar circumstances as single parents. They had been friends for several years, sharing parenting responsibilities for first the two, then the three children.

On June 14, 1984, when Deneke was 13 months old, Margarette was tragically murdered. Her nephew, Ernest Altril, was arrested, and charged with the murder. He is presently committed to a mental institution, having been determined unfit to stand trial. Custody of Damian was assumed by his father, Claude Grant. Petitioner and respondent agreed to serve as coguardians of Deneke and a decree of consent reflecting the agreement was entered on July 30, 1984. In conjunction with that agreement, it was stipulated that Deneke would live with Carol. Thomas allowed Carol to move into the larger first-floor apartment previously occupied by Margarette.

On or about December 27, 1984, at the conclusion of a scheduled visit by both Chanel and Deneke, Thomas returned only Chanel and informed Carol that he was going to assume sole custody of Deneke. On January 10, 1985, without notifying Carol, he sent Deneke to stay with his sister, Nellie Henley, in the Virgin Islands. When Carol filed a petition for a writ of habeas corpus in the Territorial Court of the Virgin Islands, he brought the child back to New York. Thereafter, he locked Carol out of the first-floor apartment. On February 11, 1985, based upon allegations that Thomas had assaulted her the evening of Friday, February 1, 1985, Carol obtained a temporary order of protection against Thomas, and a summons was issued. Carol thereafter commenced the instant proceeding to revoke Thomas' letters of guardianship, and for temporary and final orders of protection against Thomas, alleging that his resort to self-help, and his subsequent assault upon her on February 1, 1985, when, while allowing her to remove her possessions after having locked her out of the first-floor apartment, he grabbed her by her shoulders and repeatedly struck her with an open hand, demonstrated his unfitness. Thomas cross-petitioned to revoke Carol's letters of guardianship alleging, *inter alia,* that Carol mismanaged funds provided for the support of Deneke; that due to her lifestyle she neglected Deneke, in that the infant had severe diaper rashes on numerous occasions and colds on several occasions; and that she refused to allow Gladia Matthews, Margarette Grant's sister and Ernest Altril's mother, any visitation. He further alleged that Carol is neither "able, equipped, or qualified to provide proper care and maintenance". The court appointed a guardian ad litem for the child, and a trial was held on May 31, 1985, June 7, 1985 and July 1, 1985, during which the parties and nine other witnesses testified. The witnesses testified to the aforementioned facts. In addition, testimony was introduced concerning the psychological effects of changing custody; the quality of the respective home environments; the character, temperament and sincerity of the petitioner and respondent cross petitioner; their respective financial statuses; and their ability to provide for the child's emotional and intellectual development.

The evidence at the trial established that Carol is 32 years of age, is employed full time as a switchboard operator for the Bronx Municipal Hospital, and receives approximately $500 per month in Social Security benefits on Deneke's behalf as well as $300 per month from the family for Deneke's support.

Carol described Deneke's abduction, her efforts to secure Deneke's return, and Thomas' assault upon her. Carol stated that Thomas' seizure of Deneke was similar to a prior incident which occurred when Carol was 14 years of age. At that time Thomas had voiced his dissatisfaction with Carol's recent decision to live with her brother, rather than continuing to stay with Gladia and Ernest, as she had since her mother died, when she was nine years of age. On the pretext of having her baby-sit for him, she came to Thomas' house only to be transported to the airport and flown back to St. Thomas to live with Nellie Henley, the sister to whom Thomas had entrusted Deneke.

Dr. Bernice Schaul, a clinical psychologist, interviewed Carol, at the request of the guardian ad litem, for a total of 5½ hours on three separate occasions and prepared a report. She did not interview Thomas. She essentially testified that Deneke had experienced psychological trauma in abruptly separating from her mother, and that Carol was well-suited to provide the "holding environment", primary attachment, consistency, reliability, and empathetic caretaking Deneke required. Her report and testimony indicated that Carol had made a well-considered decision, is "sincerely motivated" to care for Deneke, and does so in a responsible and sensitive manner. She termed the incident of abduction "unfortunate" and potentially detrimental on a continued basis. Daniel Barr, a social worker whom Carol had seen for counseling immediately following Margarette's death, conducted a social work assessment of Carol and her family. He saw her on 14 occasions, three times in her home, and twice suggested terminating counseling because she was progressing well. His testimony corroborated Dr. Schaul's positive findings concerning Carol's capability to care for the child.

Thomas White testified on his own behalf. He is a 42-year-old former police officer, retired on an annual disability pension of $23,000 and owns a general contracting business as well as two residential properties in The Bronx. He has been married for more than 20 years to Gladys White. The couple, and their two adult daughters, Lisa, a college student, and Cynthia, a bank employee, live in a three-bedroom private house in Springfield Gardens, Queens. Thomas stated that he had a family conference before deciding to assume sole custody and guardianship of the child. He denied having sent Carol to the Virgin Islands as a teen-ager. He admittedly had not visited Deneke on a regular basis when her mother was

alive, seeing her only when he collected rent, made repairs, or paid her mother an occasional visit. As to the alleged assault, he testified that Carol hit him, but did not deny having assaulted her. Gladys testified that she would be home to care for Deneke, except for one day a week, when she works. She also indicated that Carol loves the child and "would take very good care of her". Gladia Matthews testified "absolutely" that she is the natural person to assume Deneke's care, but that the family had decided against it "under the circumstances".

The court-appointed guardian ad litem interviewed the parties, the other members of this extended family, and other individuals. She also consulted Dr. Schaul. She prepared a 27-page report, summarizing the interviews and the consultation, and made a recommendation to the court. She concluded that Carol would provide "the far better environment for the child" because of the length of their relationship, her efforts to foster a close familial relationship between Deneke and her half brother Damian, her personality and excellent parenting capabilities as demonstrated by her care of Deneke and Chanel's stability and accomplishments. The guardian ad litem indicated that Chanel is pretty, well-dressed, articulate, friendly, and very composed. She is a conscientious straight A student, is graded "excellent" in all character categories, and has nearly perfect attendance at the parochial school which she attends, Our Lady of Grace. Her comprehensive test scores indicate achievement considerably above her grade level. She reads at the 8.9 grade level, while in the third grade. The guardian ad litem found that Chanel was an exceptional child, which she attributed to Carol's abilities as a mother in combination with Chanel's natural capabilities. The report reflects that Damian's father, Claude Grant, who has a Master's degree in clinical psychology and has worked as a therapist for teen-agers, believes Carol is "terrific" with Deneke. He feels Thomas would be an unsuitable guardian because he is "rigid, inflexible and judgmental". Dr. Barr advised the guardian that, in his opinion, Carol would be a wonderful custodian for Deneke. He stated that they are strongly attached and that Carol provides a lot of stimulation, physical warmth, communication, and patience, although she sets appropriate limits for Deneke. The guardian's report further notes that Thomas indicated that there should be "no strings to custody" because "He doesn't think it right for anyone to be restricted geographically or have mandated visitation, he may want to go South or to the Islands." She also noted he "believes that

Deneke is not eating enough when with Carol. She has recently lost weight and has gotten very quiet. I pointed out that Deneke is with [him and his family] most of the time. I received no response." The guardian ad litem described Gladys as nice, removed, "disinterested, but kind".

The guardian ad litem concluded that Thomas was a decent man, but considered his resort to self-help as evidence that he lacks insight, may be unwilling to obey court orders, and is insensitive to the needs of others. She opined that he was motivated by patriarchal feelings and a desire to assist Gladia, and that his actions are dictated by his own sense of "omnipotence". When interviewed, Gladia Matthews expressed strong disapproval of Carol's life-style and criticized Carol's decision to enroll Chanel in a special school because "if Chanel is bright, she'll do well anywhere". She stated that she had advised Thomas that Carol needed psychiatric help. She also indicated that she was the natural person to have the child, but the family talked her out of it. The guardian ad litem viewed Gladia as "self-righteous, severe, rigid and judgmental". She expressed serious concern that Gladia "may be mentally ill and a very destructive influence". She recommended that sole custody be awarded to petitioner, with visitation rights provided for respondent.

The Surrogate found that Carol was a warm, loving, and caring person who is providing exemplary care for her own child that is beyond criticism and has given equivalent care to Deneke. The court further found the day care arrangements she had made responsible and appropriate, and that the charges of neglect were unsubstantiated. Although the court noted that neither affluence nor the two parent household structure are dispositive considerations in determining the best interest of a child, it determined that respondent should be awarded custody, stressing the child's adaptability, and the stability and financial advantages respondent, his wife, and family could provide. The court stated: "[C]ross-petitioner offers to Deneke incorporation in a well-established and stable family which can offer untold advantages in education, extended training, and otherwise. All of this presents a valuable opportunity to enrich Deneke's future life to an extent which it cannot be deduced would be available with the petitioner, and certainly would be beyond petitioner's means without the substantial financial assistance of petitioner's extended family, including the cross-petitioner. It is further concluded that there is absolutely no evidence * * * that the infant's ties to

the petitioner are such that incorporating her as a child into the home of the cross-petitioner would have a negative, disruptive influence. The infant, at this point in time, is of sufficiently tender years so that it is apparent that she is fully capable of adjusting to [the circumstances] under which she has been essentially living * * * all other elements being essentially equal, weight must be given to the advantages which cross-petitioner, his wife and his two adult daughters, as a family unit, can confer upon the infant."

On the other hand, the Surrogate speculated that Deneke's role in Carol's life would be uncertain in the event Carol decided to marry and have children in the future. The court determined that the instance of self-help, which should ordinarily be discouraged, should be submerged to greater considerations bearing upon the child's welfare. It discounted the uncontroverted evidence of assaultive behavior by terming it an "alleged altercation". The court appropriately praised the "extensive, generous and most able services" of the distinguished attorney, Eleanor B. Alter, who served as guardian ad litem, *pro bono,* but concluded that her impressions could not override the proven record of the respondent and his wife as successful parents, since they were based on "speculation" and relatively limited contact with them. We disagree, and reverse for reasons discussed below.

The "best interest of the child" in the "totality of circumstances" is the touchstone for determining who shall have the guardianship and custody of an orphaned child. (SCPA 711 [9]; 1707 [1]; *Friederwitzer v Friederwitzer,* 55 NY2d 89, 94 [1982].) The court must assess the character, temperament, and sincerity of the competing parties. *(Eschbach v Eschbach,* 56 NY2d 167 [1982]; *Matter of Irene O.,* 38 NY2d 776 [1975].) Although the trial court's determination is entitled to great deference because it has the best vantage point for evaluating the credibility of the witnesses, the determination may be set aside where it lacks a "sound and substantial evidentiary basis". *(Corsell v Corsell,* 101 AD2d 766, 767 [1st Dept 1984].)

Applying these principles to the facts in the present case, in our view the Surrogate's decree is against the weight of the credible evidence. Carol is the better custodian for Deneke based upon her strong relationship with the child for most of her life and her commitment to maintaining the relationship between Deneke and Damian. *(See, Matter of Ebert v Ebert,* 38 NY2d 700, 704 [1976].) In contrast, there was only a tenuous

relationship demonstrated between Deneke and respondent's immediate family. Although the child is of tender years, the psychologist testified and indicated in his report that Carol was capable of providing the necessary "holding environment" and of meeting the special needs engendered by Deneke's abrupt loss of her mother. In light of this testimony, and the guardian's report reflecting Thomas' statement that Deneke had recently lost weight and had become somewhat withdrawn, we believe the Surrogate should have given greater consideration to the potentially adverse psychological consequences of a change in custody. *(Matter of Abendschein v Gatti,* 105 AD2d 1101 [4th Dept 1984].) The court's reliance upon the child's adaptability, without more, to justify the change in custody was unwarranted.

The record contains evidence that respondent is not as sincerely motivated as Carol, and is temperamentally less suited to the task of providing appropriate parental guidance. We agree with the guardian ad litem's view that Thomas is insensitive to the needs of others and that his actions may sometimes be motivated by a sense of his own "omnipotence". Moving Deneke, an infant in need of continuity, from place to place, and, in the process, depriving petitioner of access to her, evidences lack of understanding for the well-being of Deneke. Such conduct reflects his insensitivity and inability to understand the meaning of the separation Deneke has experienced. Abduction and conduct interfering with visitation rights raises a strong probability of unfitness. In our view, the instant episode of self-help is not one which should be treated lightly, particularly given the uncontroverted evidence of Thomas' subsequent assaultive behavior. *(See, Matter of Gloria S. v Richard B.,* 80 AD2d 72, 77 [2d Dept 1981]; *see also, Matter of Bennett v Jeffreys,* 40 NY2d 543, 550 [1976].)

Thomas' "superior [financial] resources and stable background" pale in significance when contrasted with Carol's clear interest and unusual ability to cope with raising Deneke, sensitively and lovingly, during these crucial formative years. *(Compare, Eschbach v Eschbach, supra,* at p 174.) This ability is demonstrated by her having raised Chanel, in an admirable way, to be a truly outstanding child, despite her financial and single-parent status. Our determination finds further support in light of the necessity to minimize the negative influence of Gladia Matthews. In sum, consideration of all relevant factors favors the award of custody to petitioner, notwithstanding her less affluent financial circumstances *(Matter of D'Alessandro v*

*Parisi,* 60 AD2d 897 [2d Dept 1978]) and status as a single parent *(see, Obey v Degling,* 37 NY2d 768 [1975]).

Decree, Surrogate's Court, Bronx County (Gelfand, S.), entered on December 2, 1985, which denied and dismissed the petition and granted the cross petition awarding sole custody of Deneke Grant to respondent Thomas White and vacated the interim order providing petitioner with fixed visitation rights, should be reversed, on the law and the facts, and the petition granted, awarding custody to petitioner, Carol White, without costs.

SANDLER, J. P., ASCH, KASSAL, ROSENBERGER and ELLERIN, JJ., concur.

Decree, Surrogate's Court, Bronx County, entered on December 2, 1985, unanimously reversed, on the law and the facts, and the petition granted awarding custody to petitioner, Carol White, without costs and without disbursements.